James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Scott D. Hirsch
Charles E. Scarlett
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Suite 200
Boca Raton, FL 33434
(561) 278-6707
(561) 278-6244

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, FL 33143
(305) 357-9000

Daniel E. Gustafson
Daniel C. Hedlund
David A. Goodwin
Eric S. Taubel
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDITH OCHOA, WENDY P. ECKERT, and BRENDA GOLD, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PERSHING, LLC,<br><br>Defendant. | Civil Action No.<br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Judith Ochoa, Wendy P. Eckert and Brenda Gold, by and through their counsel Scarlett & Hirsch, P.A., Criden & Love, P.A. and Gustafson Gluek PLLC, bring this putative class action lawsuit on behalf of individuals and entities who were defrauded by Pershing, LLC ("Pershing" or "Defendant") as a result of Pershing's role in facilitating and profiting from the R. Allen Stanford Ponzi scheme described below. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs incurred substantial financial losses.

## I.       PARTIES

1.       Plaintiff Judith Ochoa is a citizen of the State of Florida and presently resides in Miami, Florida.

2.       Plaintiff Wendy P. Eckert is a citizen of the State of Florida and presently resides in Vero Beach, Florida.

3.       Plaintiff Brenda Gold is a citizen of the State of Florida and presently resides in Orlando, Florida.

4.       Defendant, Pershing, LLC ("Pershing"), is a Delaware limited liability company doing business in Florida, with its principal place of business at 1 Pershing Plaza, Jersey City, New Jersey, 07399.  The sole member of Pershing LLC is Pershing Group LLC (a Delaware LLC with its principal place of business in New Jersey) and the sole member of Pershing Group LLC is The Bank of New York Mellon Corporation (a Delaware corporation with its principal place of business in New York).

## II.       VENUE AND JURISDICTION

5.       Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendant's home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.       Venue is proper in the United States District Court in and for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1) as it is the judicial district in which the defendant resides.

2

### III.   FACTUAL ALLEGATIONS

#### A.   Introduction

7.     On February 17, 2009, the FINRA broker/dealer solely owned by Allen Stanford, Stanford Group Company ("SGC"), and solely-owned Antiguan bank, Stanford International Bank, Ltd. ("SIBL"), were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws by their integral involvement in the second largest Ponzi scheme in American history.

8.     Despite numerous red flags, including knowledge that the Securities and Exchange Commission ("SEC") was investigating the sales practices related to the SIBL certificate of deposit ("CD") in 2005, Pershing entered into a clearing agreement on December 27, 2005 with SGC and rendered material assistance to the Allen Stanford Ponzi scheme from 2005 through February 17, 2009. As a result, investors who purchased CDs issued by SIBL lost $7.2 billion. The magnitude of the Stanford Ponzi scheme would have been impossible to achieve without Pershing's indispensable material aid in growing SGC, thereby substantially increasing the sales of the SIBL CDs. Pershing's assistance extended far beyond the ministerial functions of clearing trades and wiring funds to purchase CDs, and, as a result, Pershing facilitated the increase of sales of SIBL CDs from approximately $2.8 billion at the end of 2005 to more than $7.2 billion by the end of 2008.

9.     Despite SGC's dependence on the 3% referral fees for CD sales paid by SIBL and on Allen Stanford's continual infusion of cash to maintain the broker/dealer's staggering overhead, Pershing never obtained answers to critical questions that members of its senior management repeatedly articulated as the necessary requirement to determine the legitimacy of the entire Stanford business model, which was anchored by the revenues generated by the sale of CDs. Pershing Executives attempted to meet privately with Stanford Executives as its

"committed partner" to "gain a much deeper understanding of the finances of the group companies, particular [sic] the offshore bank, broker dealer, and the affiliated banking/brokerage companies, and the extent of Stanford's (Allen) commitment, particularly relative to the projection that by year end 2007 Stanford will have close to $120 mm invested in the BD." Regardless, Pershing never discovered:

- The underlying assets for the purported investment portfolio of SIBL;

- The identity of the money managers for the purported investment portfolio of SIBL;

- How the money managers sustained an annualized return sufficient to cover the 3% referral fees and the overhead of SIBL despite volatile, and for the most part, down global markets;

- Allen Stanford's source of wealth that funded SGC with more than $165,000,000 necessary to make up the consecutive quarterly losses of SGC; and

- Proof that Allen Stanford's "wealth" even existed so as to be able to continue to infuse cash to SGC.

10.    Pershing never received answers to any of these questions for the entire three-and-a-half-year period it facilitated Stanford's Ponzi scheme, yet it continued to provide vital services to the Stanford entities. Pershing also knew that SIBL was audited by a one-man accounting firm in Antigua, which is highly abnormal for this type and size of investment vehicle. Pershing also knew that the SEC was also investigating Stanford Financial Group ("SFG"). During the period in which Pershing provided these services, Pershing knew Stanford was subject to virtually nonexistent regulation in Antigua. These facts, combined with the extended period of time Pershing allowed Stanford to ignore and simply refuse to respond to its repeated questions, are more than sufficient to support the reasonable inference that Pershing had a "general awareness" of Stanford's underlying wrongdoing. Pershing rendered substantial assistance to Stanford by

exercising professional expertise and judgment which was motivated by its own financial interests as well as the financial interests of Stanford. Pershing's conduct impermissibly put its own financial interest before the interests of Plaintiffs, who suffered substantial financial losses as a direct and proximate cause of Pershing's conduct.

**B.    Pershing Shed its Rule 382 Protection**

11.    New York Stock Exchange ("NYSE") Rule 382 allowed an introducing broker to enter into a contract with a clearing broker, wherein the clearing agreement between the introducing broker and clearing firm must specify the respective functions and responsibilities of each party.[1] Essentially, NYSE Rule 382 protected clearing firms from liability for an introducing firm's conduct provided that the clearing firm performed <u>only</u> the ministerial functions delineated in the clearing agreement. By way of example, NYSE Rule 382 absolved a clearing broker from liability if the clearing firm:

- Provided only "back-office" services;

- Provided processing and administrative services in connection with securities transactions;

- Played no role in the introducing firm's sales activities; and

- Involved itself in a transaction only after a trade had been ordered or otherwise authorized by the customer.

12.    Pershing manifestly disregarded the well-settled principles regarding clearing firm liability by materially participating in and aiding and abetting Stanford's wrongdoing.[2]

---

[1]    NYSE Rule 382, though in existence at the time of the Stanford Ponzi scheme, has been replaced by FINRA Rule 4311.

[2]    On December 8, 2014, United States District Judge David Godbey in the Northern District of Texas assigned to oversee the class action, *Turk v. Pershing, L.L.C.*, Civ. Act. No. 3:09-CV-2199-N (N.D. Tex. 2009), and related litigation, ruled that Pershing is not entitled to blanket immunity as a clearing broker and can be held liable as such. A true and correct copy is

13.     Pershing maintained a close relationship with Stanford, acknowledged repeatedly by Pershing's Senior Executives as a "strategic partnership" and "trusted business partnership" that defied the industry standard for a clearing broker. Pershing referenced its partnership with Stanford not only internally, but also in direct communications with Stanford recruits and Stanford personnel. Pershing held itself out as Stanford's "trusted strategic partner" in addition to Stanford's clearing firm, a dual role that distinguishes between the processing vendor function of a clearing firm and the trusted business partner function that Pershing engaged in. For example, in order to obtain Stanford's business, Pershing differentiated itself from other clearing brokers "first and foremost" by its commitment to a strategic business partnership approach as opposed to a role as simply a clearing firm.

14.     Pershing removed itself from any possible protection of NYSE Rule 382 by engaging in the following actions:

- Initiating the recruitment of Financial Advisors ("FAs") for SGC even <u>prior</u> to entering into a contractual relationship with SGC and during its relationship by selling the Pershing/Bank of New York relationship and putting on the "Pershing face" to lend reputational enhancement to Stanford;

- Giving assurances to both recruits and already recruited FAs that Pershing had completed a thorough due diligence on Stanford to eliminate any apprehension that the FAs had about recommending the CD product to their clients despite insufficient or non-existent due diligence;

- Attending and participating in Top Producers Club ("TPC") meetings in which brokers who sold at least $2 million in SIBL CDs were given a "reward trip";

- Exercising professional judgment about whether to accept orders for processing and whether to execute transactions in customer accounts; and

---

attached as Exhibit "A." This determination is consistent with the Court's Order in *Kneese v. Pershing, L.L.C.*, Civ. Act. No. 3:10-CV-1908-N (N.D. Tex. 2010), *See* Nov. 14, 2012 Order [21] at 8-10. A true and correct copy is attached as Exhibit B.

- Ensuring that the introducing broker was meeting net capital and other regulatory requirements.

15. Moreover, Pershing provided the following additional services that extended beyond the permissible functions and responsibilities allocated to Pershing as a clearing firm:

- Leveraging the Bank of New York Mellon Wealth Management team for private banking products such as lines of credit, standby letters of credit, aircraft loans, unsecured credit, and other lending alternatives;

- Securities Based Lending Solutions, including CreditAdvance, a margin lending product, LoanAdvance, a consumer lending product, RealAdvance, a mortgage solution offered by Bank of New York Mortgage Solutions LLC, and Collateral Monitoring Service;

- Wrap Account Services, including money manager services (buying and selling securities);

- Sales and marketing functions on the broker interface NetExchange Pro;

- Money Management Research (pre-transaction information); and

- Financial Planning Software.

16. As a result, because Pershing moved well beyond performing routine clearing functions that are post-transactional, ministerial, administrative and mechanical, Pershing is no longer subject to the protection of NYSE Rule 382 and therefore can and should be held liable for the Plaintiffs' losses.

**C.    The Pershing-Stanford Relationship**

17. In May 2005, Pershing began discussions with Stanford management about taking over the role as the custodian and clearing firm for SGC. Stanford cleared with Bear Stearns, and had continually done so, since SGC began business in 1996.

18. In 2005, Stanford decided to embark on an ambitious and challenging growth plan for SGC to add over 100 new FAs and to open numerous new branch offices around the world.

The anticipated growth of SGC was the impetus for the Pershing-Stanford relationship. Prior to teaming up with Pershing, Stanford explained its expansion plan that included looking for a strategic partner to assist Stanford in its growth. Pershing desired to be that partner.

19.     One of the earliest meetings between Pershing and Stanford personnel took place at Pershing's headquarters at Pershing Plaza in New Jersey. Pershing's senior management was involved in forging the relationship with Stanford. Claire Santaniello, Pershing's Chief Compliance Officer, and John Ward, its Relationship Manager, were two of the principals involved in the New Jersey meeting. At the outset, Stanford wanted the credibility of having a relationship with a firm like Pershing. As demonstrated below, that credibility, or "reputational enhancement," of Pershing was absolutely critical and was called upon time and time again to recruit FAs and grow SGC, and likewise to increase the sale of the SIBL-issued CDs. Pershing was more than willing to give legitimacy to the Stanford enterprise in exchange for SGC's business.

20.     Eager for Stanford's business, beginning in mid-2005, Pershing commenced its due diligence on Stanford, which proved to be no meaningful due diligence at all. One of Pershing's expressed goals in conducting due diligence into the Stanford-related companies was to rule out fraud. However, since Pershing's due diligence was superficial and grossly incompetent resulting in many unanswered questions, the possibility of fraud was ever-present throughout the three and one-half year relationship. Despite this ineffective due diligence, on November 9, 2006, Ward emailed Pershing's Executive Committee: "All of you are aware of the extensive due diligence conducted before we decided to bring on Stanford as a new IBD.[3] This decision was made with the full knowledge of their organizational structure, business strategy, growth plans, and profile of their customers." This is simply false.

---

[3]     The acronym "IBD" stands for "Introducing Broker Dealer."

21.     Pershing performed perfunctory due diligence on the Stanford companies (including SIBL and the "jewel" of the Stanford enterprise, the SIBL CD) despite the fact that the clearing agreement signed by Pershing and SGC and Pershing's "commitment to support [Stanford's] global growth *require[d]*" Pershing to dig deeper into questions about "the global organizational structure of Stanford, including source of funds, capital, P&L, and the strategic vision for the group of companies." (Emphasis added) Additionally, Pershing was required to "go deeper into the plan for SGC, its reliance upon the referal [sic] fees generated from SIBL, and the ability of SIBL to continue generating returns to pay these referal [sic] fees. This understanding would include the portfolio investment policy and construct of the portfolios." Pershing was also aware of countless badges of probable criminal activity before and during its relationship with Stanford including:

- Allen Stanford's history of owning a bank on the Island of Montserrat, a known haven for money launderers;

- Stanford moving his bank to the Island of Antigua, with its dubious money laundering history;

- Allen Stanford's push to relax anti-money laundering regulations in Antigua;

- Knowledge of the SEC's investigation in 2005 into the sale of the CDs;

- Various news articles that reported investigations by the SEC into the CDs sold by SIBL during the period of time that Pershing was wiring cash to offshore banks where SIBL owned accounts; and

- Grave and evolving suspicions by Pershing executives that fraud and/or a Ponzi scheme was ongoing at Stanford.

22.     Although SGC was a United States-based NASD member firm, its affiliation with offshore banks, trust companies and broker-dealers with mostly non-US clients was a stated concern to Pershing. Moreover, because Pershing viewed Stanford as a very large prospect, it felt

the need to have "a sense around their controls." In sum, Pershing acknowledged that while it was not directly doing business in Antigua, it was partnering with an entity that received the majority of its revenue from an offshore Antiguan bank.

23.     Throughout the "due diligence" process, Pershing became aware of numerous troubling facts about Allen Stanford and the Stanford business model.  In 2005, Stanford's Chief Compliance Officer notified Pershing that the SEC was investigating the sales practices relating to the SIBL CD during its due diligence review.

24.     Many Pershing employees that shared concerns about SIBL and the CDs misrepresented the existence of internal questions to their superiors and to third parties, stating that they were both satisfied and comfortable with the Stanford entities and the CD product in order to maintain the ever-growing and highly profitable relationship with Stanford. Indeed, there was internal turmoil between the credit risk department and the relationship management/sales departments over the apparent "red flags" concerning Stanford.

**D.     Pershing Played an Integral Role in Defrauding Over 18,000 Victims**

25.     Pershing rendered material assistance to the Allen Stanford Ponzi scheme by growing SGC, resulting in $7.2 billion in losses to those investors who purchased SIBL CDs. As discussed above, Pershing's assistance went far beyond clearing trades and transferring funds for the purchase of CDs. Pershing took many steps to help grow SGC which resulted in a large increase in sales of the SIBL-issued CDs to investors.

**a.  Pershing was Motivated by the Opportunity to Clear $4.5 Billion in Assets**

26.     From the outset of its relationship with Stanford, Pershing was driven by its intense focus upon appropriating the more than $4.5 billion in assets cleared by SGC's previous clearing firm, Bear Stearns. Pershing did so despite not only the existence of numerous red flags

of highly suspicious activity, but also Pershing Senior Executives' growing suspicions of the existence of fraud by Stanford.

27.     Pershing worked hard to grow SGC in order to obtain the rest of the accounts that Bear Stearns still had in late 2006. Early on in Pershing's discussions with SGC, which occurred in and around mid-2005, Pershing recognized that the "driver" for SGC's business model was the SIBL-issued CD offered to investors throughout the world. It is, therefore, no coincidence that sales of the CDs exploded with Pershing at Stanford's side. From 2005 through the end of 2008, SIBL reported that its CD deposits had increased from $2.8 billion to more than $7.2 billion. (By comparison, it took 15 years — from 1986 through 2001 for deposits to reach $1 billion.)

### b.  Pershing Ignored the Red Flags and Disregarded Corporate Policy

28.     Throughout its relationship with Stanford, Pershing discovered numerous red flags that required it to, at a minimum, re-evaluate its relationship with Stanford. Prudently, it should have immediately terminated the relationship; yet, Pershing carried on business as usual. For example, Pershing discovered that:

- Allen Stanford forfeited more than $3 million in deposits he held in his bank on the Island of Montserrat that were linked to a Mexican drug lord;

- In 2005, even before the clearing agreement with SGC was signed, SIBL was being actively investigated by the SEC;

- SGC was dependent on revenues generated by referral fees from the sale of SIBL CDs (CD-related fees constituted 71.65% of SGC's revenue in 2004 and decreased slightly to 63.62% in 2005, the overall sales of the CDs increased exponentially year after year once Pershing began assisting Stanford's growth);

- Pershing had never seen the investment portfolio maintained by SIBL;

- The executives running SGC did not know the composition of the SIBL portfolio;

11

- Essentially, the entire SIBL portfolio was managed by Allen Stanford's right-hand man, James Davis, and Laura Pendergest-Holt, neither of whom had the education or training to manage such a massive portfolio;

- The financial condition and financial statement of SIBL were audited by a one-man accounting in Antigua, C.A.S. Hewlett & Co., Ltd. — an accounting firm that no one at Pershing had ever heard of;

- Financial regulators in Antigua (the Financial Services Regulatory Commission, or "FSRC") had no work papers or documentation supporting the assets that SIBL claimed to own;

- It was the regular practice of the FSRC to simply accept at face value whatever SIBL and Allen Stanford told the FSRC about its financial condition and portfolio values; and

- Unlike anything Pershing had seen before, SIBL showed a profit in good times and bad.

29.     As a result of these mounting red flags and the lack of disclosure and transparency from Stanford, in early 2008, Pershing requested that SGC hire a third-party accounting firm to validate the balance sheets from SGC and SIBL. Pershing broached this subject with SGC on many occasions, however, SGC never agreed. During a conference call, general counsel for SIBL opposed the request, stating that it was not valid and would lead to bruised egos of the in-house auditors of SIBL.

30.     Despite this and numerous other red flags, Pershing disregarded the directives of its Anti-Money Laundering ("AML") Compliance Manual by ignoring Stanford's suspicious activities. Pursuant to its own corporate policies, Pershing must comply with the Bank Secrecy Act ("BSA"), the U.S. Patriot Act, and other AML laws and regulations including record keeping, transaction monitoring, and suspicious activity reporting. Pursuant to Pershing's rules and regulations, when due diligence cannot be adequately performed because it is unable to take reasonable steps to detect and report possible instances of money laundering or to obtain

adequate information, an AML Compliance Officer must be contacted immediately and must review the circumstances to determine whether to refuse to open the account, suspend trading activity, close the account, or file a Suspicious Activity Report ("SAR").

31.     As a result of facts in its possession, Pershing had concerns that SIBL may be engaged in fraudulent conduct and one Pershing senior executive actually reduced these concerns to writing which he conveyed to other high level executives. The executive questioned how SIBL could pay such high interest rates on its CDs and also pay referral fees to SGC FAs in light of what was possible to earn on its investment portfolio.

32.     Throughout the Pershing/Stanford partnership Pershing witnessed Stanford's suspicious activity on a regular basis. From the moment the relationship began in 2005, Stanford exhibited an unwillingness and reluctance to provide information about its business and the source of its investment funds and assets. At every turn, Stanford delayed the disclosure of information by making excuses and being unresponsive. Pershing continued to do business with Stanford despite the suspicious activity, despite its expressed concerns concerning SIBL's business practices, and despite that fact that Pershing was prohibited from doing business with entities who affirmatively refuse to provide key information requested by Pershing (unless an exception is approved by Pershing's Anti-Money Laundering Oversight Committee ("AMLOC")).

33.     Moreover, Pershing's Know Your Customer ("KYC") policy required Pershing to know both the end investor and the introducing broker-dealer ("IBD"), here SGC, to enable the firm to detect suspicious activity and to comply with federal AML regulations. KYC is intended to confirm that Pershing has sufficient information about its customers to assess them and to also assess the legitimacy of the transactions they conduct. It is also designed to enhance Pershing's ability to report suspicious activity.

KYC standards include, at a minimum:

- Establishing the true identity of the customer and other related parties to the account;

- Screening customer and related party names against government lists;

- Obtaining additional information and documentation as needed to understand the customer's risk level, determine the need for enhanced due diligence, and facilitate the detection of suspicious activity;

- Determining the customer's source of funds;

- Understanding and recording the account's purpose and anticipated transaction behavior; and

- Maintaining up-to-date knowledge of the customer through ongoing client contact and periodic reviews.

34.     Pershing policies also mandated a more extensive due diligence for less well-known IBDs, such as SGC, with a significant non-US customer base, substantial ownership by a non-US parent, and/or a location in a high risk jurisdiction.  According to securities industry rules and Pershing's own policies, due diligence is not an isolated exercise engaged in prior to executing a clearing agreement. Pershing's due diligence on Stanford was an ongoing requirement. Thus, in order to "know its client," Pershing was mandated to put Stanford through an annual or bi-annual enhanced review whereby Pershing would gather information on its principals, look at negative press, pending or prior litigation, and significant incidents.

35.     Notably, Pershing's Chief Compliance Officer, who was also a member of the IEDDC and Pershing's Credit Committee, was not responsible for ensuring that Pershing followed such policies. Rather, the relationship management team, or sales force, was responsible for the periodic review of Stanford. Yet the relationship management team's role with respect to Stanford was to advocate for Stanford. Pershing enlisted the very employees who worked to secure the relationship with Stanford (despite all the red flags) to be responsible for

reviewing Stanford's activity and to determine whether it was suspicious. Moreover, Pershing's Credit Committee and/or Compliance Department should have assessed the relationship management's periodic review of Stanford due to Stanford's higher risk, yet that never occurred. The Chief Compliance Officer was neither familiar with, nor did she verify, the exact process the relationship management team engaged in to review and approve Stanford on a periodic basis. In fact, it is doubtful that any such mandatory review ever took place.

### c.  Pershing and Stanford Engaged in a "Strategic Partnership"

36.  Pershing often described its relationship with Stanford as a "strategic partnership" and worked tirelessly to help grow the Stanford business. Pershing was willing to be a partner with SGC and assist in the growth of SGC as its "strategic partner." For example, Pershing distinguished itself from Bear Stearns "first and foremost" by its commitment to a "strategic business partnership approach to relationship management" — not by its role as simply a processing vendor. In fact, Pershing was willing to be in a "partnership without limits" with Stanford.

### d.  Pershing Recruited Stanford's Financial Advisors

37.  From 2005 through February 17, 2009, Pershing played a central role in recruiting preeminent FAs for SGC. Notably, Pershing recruited FAs for SGC even *before* the clearing agreement was even executed.  Much of Stanford's growth during this time came from a focused effort to recruit top talent from major brokerage firms. Prior to working at SGC, this select group of FAs had successful careers with valued clients. Pershing understood that recruiting FAs was critical to growing SGC and SIBL, and that the acquisition of FAs with large books of business was the most efficient way to gain assets. It was common knowledge to Pershing that a certain percentage of assets brought over by the FAs to SGC would be used to purchase SIBL CDs.

38.     As part of the recruiting process, FAs were often invited to Stanford's Houston office for presentations intended to entice them to work at SGC. Pershing personnel, including relationship management executives, participated in the recruiting sessions. A typical recruiting session would be held at Stanford headquarters where the recruits would receive an agenda comprised of scheduled meetings with Stanford personnel as well as specific meetings with Pershing personnel. Oftentimes, a Pershing relationship management executive would attend recruiting meetings as the sole Pershing representative, despite the individual's lack of subject matter expertise on Pershing's technology/operational systems. The relationship management team attended the recruiting meetings simply to sell the "Pershing face" and to provide a perspective of the "relationship and representation" of Pershing/Bank of New York. If Pershing personnel were unavailable to attend the meetings in person, recruits would be escorted into a conference room to conduct a telephone conference with the relationship management team at Pershing.

39.     During recruiting meetings, Pershing would engage in reputational enhancement by supporting Stanford with the Pershing name and the name of its parent company, Bank of New York. Not only would the recruits get to work with Pershing once they joined Stanford, but Pershing would also "deliver the whole firm," *i.e.*, Pershing and the Bank of New York. To the recruits, many of whom had never heard of Stanford before, the support and endorsement by Pershing and the Bank of New York gave instant credibility to the Stanford enterprise. Pershing even admitted to recruits that while Stanford did not have a prominent name in the financial community, its partnership with Pershing/Bank of New York would provide the necessary reputational confirmation to attract clients.

40.     Pershing's name and reputation were invaluable to Stanford. Pershing was known for being reliable and had a history of working only with first-rate broker/dealers. Pershing

16

touted itself as having a name that was synonymous with high quality clearing and execution in the industry. Thus, its strength in endorsing Stanford was critical to any recruit coming from a wire house to a smaller firm. Some recruits expressed excitement about working with a big name like Pershing because of its gravitas and access to resources. Consequently, Pershing's representations carried a tremendous amount of weight and were an integral part of the FAs' decision to work at Stanford.

41.     When anyone at Pershing was questioned about its relationship with SIBL, Pershing unequivocally represented to recruits that it had completed its due diligence on Stanford, including SIBL. In fact, Pershing informed FAs that the due diligence process for Stanford took longer than average due to the vetting process for SIBL. Although the SIBL CDs were not on its platform, Pershing represented that it completed due diligence on SIBL because it was part of the Stanford business and Pershing was transferring customers' funds to the Bank for the purchase of CDs. Moreover, Pershing vouched for the SIBL CDs as legitimate investments. Pershing withheld the fact that, internally, it had open questions about SIBL and the CDs that SIBL issued. Moreover, as Pershing's concerns grew, it never retracted its endorsement of Stanford and the SIBL-issued CDs.

42.     Based on Pershing's assurances regarding SIBL and support of the CD product, FAs not only recommended investing in the CDs to their clients, but also many FAs personally purchased the CDs and advised their family members to do so as well.

43.     An example of Pershing's involvement in recruiting with a laser focus on growing SGC and thus the SIBL CDs, was evident in the Stanford Miami office. The Stanford Miami office was registered with the NASD (later becoming known as the Financial Industry Regulatory Authority or "FINRA") as an Office of Supervisory Jurisdiction. Accordingly, the Miami office was charged with supervision and compliance oversight of all Stanford Latin

17

America branch offices. Stanford Miami was a unique office in that it was comprised of both SGC brokers and Stanford Fiduciary Investor Services ("SFIS") trust representatives. The SFIS trust representatives sold only SIBL CDs, while the SGC employees sold SIBL CDs along with other investments.  Although Pershing only cleared the SGC transactions, Pershing was aware that the Miami office was the hub for Latin America and that the SFIS trust representatives were top CD sellers (and invitees of TPC meetings as discussed below). When Pershing executives visited the Miami office, they would often attempt to entice the SFIS trust representatives to get their securities licenses in order to recruit them to join SGC.  Indeed, Pershing visited the Stanford Miami Office frequently, discussed the CD product and "backed up" Stanford's operation of selling the CDs.

44.    Specifically, Pershing told the FAs and the individuals Pershing targeted for recruitment (*i.e.*, SFIS trust representatives) that it would be easier to sell the SIBL CDs with the support of the Pershing/Bank of New York name.  Thus, Pershing explicitly encouraged FAs to use the Pershing/Bank of New York name in selling the CDs in order to increase sales.  Even after financial advisors were recruited, Pershing executives continued to validate the Stanford enterprise as they attended the TPC meetings, in which brokers who sold at least $2 million in SIBL CDs in any given quarter were given a "reward trip." The TPC meetings were strictly for advisors who did business with SIBL (SGC business was irrelevant). Nevertheless, Pershing attended the SIBL-only conferences, knowing full well they were attended by SGC FAs and SFIS trust representatives, because Pershing wanted to support and grow the sales of the SIBL-issued CDs.

### e.    Pershing Provided Assurances Directly to FAs and Investors

45.    The ongoing assurance of Pershing's relationship with Stanford was a comforting factor in investors' decisions to buy and hold CDs. The FAs and investors did not have the same

degree of access into the bank's portfolio as did Pershing, in theory. Being told that Pershing had transparency into the bank and was "satisfied" with everything it saw validated the CD program in the eyes of the FAs, assuaged any concerns they might have had, and encouraged the FAs to sell more CDs or recommend that their clients hold existing CDs. Although FAs were recruited across the country and at different periods of time, they were told nearly identical stories about Pershing's due diligence on Stanford and were given the same sales pitch that Pershing fully backed Stanford, SIBL, and the SIBL CDs.

46.     Pershing assured the FAs that it did its investigation on Stanford and was pleased with the results. If not, it would have never become Stanford's partner and lend Stanford its name and reputation. The Pershing investigation, as represented, included travelling to Antigua to visit SIBL on more than one occasion. After "diving deeply" into SIBL's portfolio, Pershing proclaimed that it was pleased with Stanford's transparency and was very comfortable with the portfolio. However, this representation to the FAs was false. Pershing further boasted that SIBL provided a unique product for brokers to sell to their clients, but never informed the FAs that Pershing had numerous open questions about the CD and never retracted its endorsement as its concerns increased.

47.     Pershing reassured the customers of SGC with communications to the FAs designed to reach the investor. Significantly, two representations from Pershing induced holders of the CDs to refrain from redeeming. First, a mass email was sent on behalf of Pershing's CEO, Richard Brueckner, on October 3, 2008, to all FAs of SGC containing "key facts and information" about Pershing and Bank of New York and their "strong position" to protect clients' assets and mentioning both Securities Investor Protection Corporation and Customer Asset Protection Company. The intent of this email blast was to assuage any concerns of SGC FAs during the roiling markets of October 2008. It was also designed to consist of a "comfort

19

email," intended to be disseminated to the customers of each FA so as to prevent market hysteria. A "Pershing Bulletin" dated December 12, 2008 was also designed to reach the SGC customer in the same manner and for the same purpose. The "Pershing Bulletin" included a form letter that the SGC FAs could send to each of his or her customers. Pershing, however, failed to alert the investors of the numerous suspicious circumstances it had long been concerned about. Neither the comfort email nor the bulletin put investors on notice that the CDs were not covered by any of the touted insurance or the financial wherewithal of either Pershing or the Bank of New York.

### f.    A Pershing Senior Executive Sensed Fraud Immediately

48.    Richard Closs ("Closs") is a Senior Executive hired by Pershing in May 2006 as a credit risk manager. Immediately upon his arrival, he was assigned to conduct an independent review of the SIBL/SGC relationship in order to obtain answers to critical questions that remained outstanding six months after the contract between SGC and Pershing was executed.

49.    Initially, Closs focused Pershing Executives upon the many unanswered questions that were raised from the outset in mid-2005 when the Senior Relationship Manager, John Ward, Global Chief Compliance Officer, Claire Santaniello, and Pershing Attorney, George Arnett, travelled to Antigua for the purpose of conducting due diligence on SIBL.

50.    The goal of Closs' independent review was to identify and verify the source of funds that were supporting SGC in the form of "referral fees." Specifically, there was concern at Pershing regarding SGC's reliance on the referral fees paid to SGC by SIBL because approximately 60% of SGC's total revenue was produced from the commissions generated by the sales of the SIBL-issued CDs. This was a remarkably high percentage of the company's revenues from a single proprietary product. Closs was also concerned that as SGC continued to lose money, more capital infusions to support SGC by Allen Stanford (as the sole shareholder)

would be necessary. Pershing did not know the source of Allen Stanford's purported wealth and never verified any aspect of it.

51.     Accordingly, Closs asked for information from Stanford that included, but was not limited to, the following:

- Detail for the source of capital that was used to support the continued losses of SGC;

- Allen Stanford's personal financial statement;

- SGC's projection for revenue growth, capitalization, and continued pay-outs to attract new brokers;

- The investment vehicles that SIBL utilized in managing the portfolio created with the CD proceeds;

- Statements verifying the holdings by outside funds and audited statements of internalized investment options;

- The capacity of SIBL to attract new deposits;

- Maintenance of the high level of return consistently paid on the CDs; and

- Contingency plans should there be a drastic reduction in sales of the CD product and the resulting referral fees.

52.     In the summer of 2006, Closs was especially concerned that Pershing did not have any knowledge of the source of Allen Stanford's wealth. Despite repeated requests by Pershing, SGC refused to produce Allen Stanford's personal financial statement. Closs discussed the possibility that Allen Stanford's funds might simply be coming from money taken in by SIBL. By August 2006, Senior Executives at Pershing were already speculating and joking that Allen Stanford was possibly taking other people's money to support his capital contributions to fund the constant shortfall of SGC. In fact, in response to a $22 million capital contribution made by Allen Stanford to SGC in July 2006, a member of the Relationship Management team emailed

Closs, remarking that "it must be nice to be rich." Closs replied: "or take other people's money......JUST KIDDING."

53.     After approximately three months at Pershing (and still no answers), Closs' concerns grew. His concerns stemmed from Stanford's failure to provide transparency and outright refusal to share pertinent information. Because Pershing never received answers to its questions that were designed to rule out fraud, the possibility of Stanford's fraud continued to exist. Despite all of this, Pershing continued to move ahead and conduct business as usual with SGC.

54.     Closs, however, persisted with his questions, causing concern at Pershing that Closs' questions would upset Stanford because Stanford had been led to believe that Pershing completed its due diligence on SIBL by the time it executed the clearing agreement, signifying its satisfaction with the SIBL CD product. At that point in time, Stanford viewed the issue of SIBL and the CDs as closed. Thus, when Closs reopened the issue by asking penetrating questions, the Relationship Managers at Pershing anticipated that Stanford would be highly displeased.

55.     Nonetheless, Closs asked SGC about the SIBL portfolio and was directed to Laura Pendergest-Holt, with whom a telephone conference was arranged. On August 31, 2006, Closs telephonically spoke with Pendergest-Holt and discussed Pershing's unanswered questions. Pendergest-Holt did not provide any answers. However, individuals at Pershing, excluding Closs, had already concluded that Closs' questions "will never get answered and although he is correct that LP [Laura Pendergest-Holt] has a big responsibility to muster at least 14+ percent……that's all we will ever know…."

56.     Following the call, Pershing executives decided to keep Closs on a "tight leash" and away from Pendergest-Holt because his questions created "internal drama" at Stanford and

could have jeopardized the budding and highly profitable relationship. A Pershing Senior Executive, John Ward, described the Closs/Pendergest-Holt telephone conversation in an email to Closs as a "relationship train-wreck" in order to prevent Closs from having further access to Pendergest-Holt or anyone at Stanford. In reality, Closs was simply trying to get answers to his questions and did not agree with the unjustified criticism he received as a result of the call. Incredibly, when Pendergest-Holt was invited to visit Pershing three weeks later for "relationship mending," Closs was not included in any meetings, in fact he was never even told she was coming, missing another opportunity to get his questions answered.

57.    During this time, Claire Santaniello ("Santaniello"), the Global Chief Compliance Officer ("GCCO") and a member of Pershing's Credit Committee, the Risk Management Steering Committee, the IEDDC, the Suspicious Activity Review and Oversight Committee, and eventually Pershing's Executive Committee, knew that Closs had a list of critical questions that needed to be answered. Inexplicably, however, Santaniello let two and a half years pass without ever following up with Closs to find out if Pershing had received answers to its outstanding questions despite working with Closs and interacting with him on a daily basis.

58.    In August 2007, Pershing Senior Executives met with Stanford Senior Executives to discuss Pershing's continuing concerns. Again, they did not get any answers. In yet another attempt to obtain information, Closs, Ward and Arnett travelled to Antigua in January 2008 to meet with the regulators of Antigua, FRSC, and the auditor of SIBL, the one-person auditing firm, to review the work papers and the audit of SIBL and its assets. As Closs waited to board the plane for the trip to SIBL, Arnett and Ward informed him that the auditor was not going to be present in Antigua, a fact that they knew much earlier and which would have caused Closs to cancel the trip had he known in advance. Once in Antigua, SIBL would not allow Pershing to review its records, and the FRSC refused as well, citing Antiguan privacy law, yet no one at

Pershing, including its counsel, Arnett, ever spoke with an Antiguan lawyer or even bothered to check whether such a law existed. It does not.

59.     By early 2008, after nearly two years of Closs' independent review, Pershing still did not have the answers to its critical questions. In February, 2008 Pershing proposed that an independent third-party conduct an audit on SIBL, but it never occurred. During the summer of 2008, news broke that Stanford was under investigation by the SEC. By November of that year, Stanford informed Pershing that it would not provide an audited financial statement for Allen Stanford, nor would it acquiesce to Pershing's request to verify the underlying assets.

60.     In response, Pershing's Chief Operating Officer ("COO"), Brian Shea, called the first of two meetings in December 2008 to discuss Stanford's refusal to provide any answers to questions that had been outstanding for over three years. Almost every Senior Executive at Pershing attended the meeting. Pershing debated whether it should terminate its relationship with Stanford, terminate the wires to SIBL, or leave everything as is. Due to concerns about Stanford's lack of transparency, Closs and Dennis Wallestad, Pershing's Chief Financial Officer, wanted Pershing to terminate its relationship with Stanford. It did not happen.

61.     After three years of Stanford's failure to provide transparency and answers to its questions, Pershing executives chose not to terminate the relationship with Stanford. Instead, on December 12, 2008, the day after Bernie Madoff's arrest, Pershing executives held a second meeting and voted to only terminate the wires to the offshore accounts so as to "incentivize" Stanford to finally provide the information that Pershing had been requesting. Pershing did not follow through with that decision and let the wiring of funds continue for another month longer, allowing millions of dollars from customer accounts to be sent to SIBL for the purchase of more bogus CDs.

62.     As of December 12, 2008, Closs and others at Pershing openly speculated about the possibility that Allen Stanford could be a fraud like Bernie Madoff, including the COO, Brian Shea. Specifically, the morning after the news of Bernie Madoffs arrest broke, a Senior Executive in the relationship management department (Tom Meder) emailed Closs asking: "You think there'll [sic] be anymore like this?" To which Closs responded, "Hmmmmm....let me see, high profile name, money manager, large asset manager...Allen Stanford???" Three minutes later, Mr. Meder replied, "Bingo!!!!!!"

63.     Pershing wanted to ensure that if Stanford turned out to be running a Ponzi scheme like Bernie Madoff, its exposure was limited, but it took no action whatsoever to protect any investors.

**E.     Pershing Does Anything It Can To Maintain Its Relationship With Stanford**

64.     Despite overwhelming evidence that highly suspicious activity was occurring, and that high-ranking Pershing executives were outwardly discussing the distinct possibility that Alan Stanford was in fact running a Ponzi scheme, the decision makers at Pershing decided that they were still not ready to give up on Stanford and the over $17 million a year in gross revenue (and growing) they were receiving from Stanford.

65.     In early January 2009, the relationship management team actually reintroduced Stanford's request that it had made earlier in 2008 for a re-pricing of Pershing's fees charged for various clearing services. In essence, Stanford was asking Pershing to lower its fees and charges to Stanford as an accommodation for its growing "business opportunity" that it was providing to Pershing. Previously, in the spring of 2008, Stanford was notified by Pershing that no re-pricing would even be considered until all of the long-outstanding questions were completely answered and Pershing was comfortable with Stanford's CD business. However, the relationship management team at Pershing became concerned that it could lose Stanford's business if it did

not acquiesce to Stanford's demand for a re-pricing of Pershing's fees and charges, as evidenced by an email from Ward to Pershing Executives on January 7, 2009. As a result of Pershing's decision to stop the wiring of funds to Stanford's offshore accounts used to purchase the CDs, Pershing executives actually believed that stopping the wires provided a "path forward" to continuing its profitable relationship with Stanford. Because Pershing was concerned that the termination of the wires could adversely impact its relationship with Stanford, the decision was made at Pershing to not only grant Stanford's request for a re-pricing of Pershing services, but also to provide Stanford with a *contract extension*. Pershing had learned that Stanford considered terminating Pershing and hiring another clearing firm or making an attempt to become a self-clearing firm. Pershing executives discussed the fact that because Stanford's termination fee was relatively nominal, any other clearing firm would be happy to pay that penalty in exchange for Stanford's business, and Pershing would lose its very "valuable client." In turn, Pershing agreed to a re-pricing and contract extension to appease Stanford, thereby keeping it off the market and continuing on with the over $17 million a year and growing revenue stream which Pershing desperately did not want to lose.

66.     Finally, despite never receiving answers to any of its critical questions for over three years, being lied to by numerous Stanford executives and officers about its business, business practices, and inability to answer certain questions, Stanford's complete lack of transparency in general, countless suspicious activities which raised serious concerns within key departments at Pershing, and the belief by high-ranking Pershing executives that Allen Stanford was a fraud and operating a Ponzi scheme, Pershing elected to continue its relationship with Stanford and to "conduct business as usual."

67.     In fact, in early February 2009, despite the concerns raised about SIBL, and just two weeks prior to the SEC's raid on Stanford headquarters, Pershing confirmed its

"commitment to [its] partnership with Stanford" through its willingness to re-price its fees and to provide Stanford with a contract extension, thus assuring Stanford that the re-pricing would provide Stanford with more money to use for its recruiting efforts, which would consequently bring in more assets and accounts to be cleared by Pershing. This plan was a "true WIN/WIN proposition" for both Stanford and Pershing. In short, despite everything that occurred, the only obstacle that stopped Pershing from continuing with its partnership with Stanford was the February 17, 2009 raid of Stanford's headquarters by federal authorities that shut Stanford down. Pershing's willingness and desire to remain Stanford's loyal partner continued until that day.

## CLASS ALLEGATIONS

68.     Plaintiffs bring this putative class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

> All persons and entities who did not have accounts with Stanford Group Company and who purchased certificates of deposit from Stanford International Bank Limited between November 1, 2006 and February 16, 2009.

69.     Excluded from the putative class are the Defendant, Defendant's directors and officers, immediate families of Defendant's directors and officers, and any entity in which the Defendant maintained a controlling interest, or that is related to or affiliated with the Defendant, or the legal representatives, agents, affiliates, heirs, successors-in-interests or assignees of any such excluded person.   Also, expressly excluded from the class are any persons and entities who have filed claims against the Defendant which are currently pending.

70.     The putative class herein differs from the putative class defined in the class action complaint filed in *Turk, et al. v. Pershing, L.L.C*., Civ. Act. No. 3:09-CV-2199-N (N.D. Tex. 2009) because all putative members of the class in *Turk* owned accounts with SGC at the time they invested in the SIBL CDs, wherein the putative members of the class in the instant action of

*Ochoa, et al. v. Pershing* did <u>not</u> have accounts opened with SGC at the time they purchased the CDs.

71.     The putative class satisfies Rule 23(a) regarding numerosity, typicality, commonality, superiority, and adequacy.

72.     **Numerosity -** The members of the putative class are so numerous and geographically dispersed that joinder of all members would be impracticable.  Plaintiffs estimate the number of putative class members to be several thousand or more.

73.     The precise number of putative class members can easily be ascertained from the records created by the Antiguan liquidator.

74.     Notice may be provided to class members using first-class mail and other means.

75.     **Typicality** – Plaintiffs' claims are typical of all putative class members' claims because Plaintiffs' and all putative class members' damages stem from:

- The Stanford Ponzi scheme that Pershing aided and facilitated;

- Pershing's breach of its fiduciary duty to Plaintiffs stemming from its failure to perform due diligence and respond to the numerous serious red flags of fraud raised by the Stanford entities; and

- Pershing's refusal to discontinue its investment relationship with the Stanford entities after it knew or reasonable should have known that the Stanford entities were a Ponzi scheme.

76.     All of these factors caused Plaintiffs and putative class members to suffer great financial harm despite the fact that Pershing stood in the best position to prevent Plaintiffs and the putative class members from purchasing the SIBL-issued CDs. Pershing's failure to perform adequate due diligence is a direct and proximate cause of Plaintiffs' injuries.

77.     **Commonality and Predominance** - Common questions of law and fact exist as to all putative class members and predominate over questions affecting individual putative class members.  Among the questions of law and fact common to the putative class are:

- Whether Pershing's continued business relationship with the Stanford entities, including its business relationship with SIBL, grew the sales of SIBL CDs causing the financial losses in question;

- Whether Pershing aided and abetted the fraud committed against Plaintiffs in light of its knowledge and suspicions of the fraudulent transactions being executed by the Stanford-controlled entities, including SIBL;

- Whether Pershing breached the intended third-party beneficiary contract it had with FINRA and the SEC by failing to comply with federal and state laws and securities industry rules and regulations;

- Whether Pershing defrauded Plaintiffs by and through its active participation in facilitating the Stanford Ponzi scheme; and,

- Whether and to what extent Plaintiffs were damaged by Pershing's conduct.

78. **Adequacy** - Plaintiffs fairly and adequately represent the putative class. Plaintiffs have retained counsel experienced in complex class action litigation.

79. **Superiority** - A class action is superior to other available methods for the fair and efficient means to resolve this controversy.  The expense and burden of individual cases for such putative class members make it quite difficult for individual class members to seek redress against Pershing for the misconduct identified in this putative class action Complaint. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT ONE
## AIDING AND ABETTING FRAUD

80. Plaintiffs repeat, reallege and adopt all preceding paragraphs as if fully set forth herein.

81. Pershing aided and abetted the Stanford Ponzi scheme which defrauded Plaintiffs. The Stanford Ponzi scheme defrauded thousands of investors, including Plaintiffs herein.

82.     Pershing possessed a general awareness of Stanford's underlying fraud.  Pershing was aware of a number of red flags concerning the CDs issued by SIBL.  For example, Pershing questioned how it was that SIBL could pay the high interest rates on the CDs that it was paying and pay the referral fees to SGC on the sales of the CDs in light of the returns possible on its investment portfolio.   Pershing also knew that SIBL was audited only by a one-man accounting on the Island of Antigua and that this was abnormal for an investment portfolio the size of which was purportedly owned by SIBL.

83.     Moreover, throughout Pershing's relationship with Stanford, numerous high level Pershing executives questioned the validity of the Stanford enterprise.  In fact, certain executives discussed that the Stanford companies were engaged in fraudulent transactions.

84.     Pershing's general awareness was also based on the fact that Pershing knew that the SEC was investigating the Stanford Financial Group during the period of time that Pershing was providing services to SGC; that Pershing knew that Stanford was subject to virtually nonexistent regulation in Antigua; that Pershing continued to lobby SGC to procure an audit from a reputable auditing firm yet was consistently delayed and/or refused; and that the numerous red flags remained unanswered for many months during Pershing and SGC's relationship.

85.     Despite Pershing's general awareness that the Stanford entities were part of an overall activity that was fraudulent, Pershing provided substantial assistance in furtherance of the scheme.  Specifically, Pershing continued to provide services to the Stanford entities, including SGC, that continued to grow SGC and the number of SIBL-issued CDs it sold. In fact, Pershing encouraged the FAs and trust representatives who sold SIBL CDs to use the Pershing/Bank of NY name in sales presentations to support the Stanford operation and to increase CD sales.

86.     The general awareness by Pershing of the above described factors imputes specific knowledge by Pershing of wrongdoing by Stanford which is tantamount to scienter and forms the basis for this common law aiding and abetting fraud cause of action.

87.     Plaintiffs seek an award against Pershing of actual damages, attorneys' fees and costs as provided by law.

**COUNT TWO**
**COMMON LAW FRAUD**

88.     Plaintiffs repeat, reallege and adopt all preceding paragraphs as if fully set forth herein.

89.     Pershing defrauded the Plaintiffs because Pershing possessed a general awareness that Pershing's role was a part of an overall activity that was improper. Pershing had sufficient reason to believe the existence of a number of red flags concerning the CDs issued by SIBL, yet Pershing continued to provide services to the Stanford entities, including SGC, that continued to grow SGC and the number of SIBL-issued CDs it sold. For example, Pershing questioned how it was that SIBL could pay the high interest rates on the CDs that it was paying and pay the referral fees to SGC on the sales of the CDs in light of the returns possible on its investment portfolio. Pershing also knew that SIBL was audited only by a one-man accounting on the Island of Antigua and that this was abnormal for an investment portfolio the size of which was purportedly owned by SIBL.

90.     Rather than immediately cease its relationship with the Stanford-controlled entities and its relationship with SIBL, the CD-issuing bank, Pershing continued to assist the continuing existence of SIBL and the growth of the sales of CDs to individuals who possessed SGC accounts and those who did not have SGC accounts but purchased CDs directly from SIBL. In fact, Pershing encouraged the FAs and trust representatives who sold SIBL CDs to use the

Pershing/Bank of NY name in sales presentations to support the Stanford operation and to increase CD sales.

91.     Pershing's general awareness was also based on the fact that Pershing knew that the SEC was investigating the Stanford Financial Group during the period of time that Pershing was providing services to SGC; that Pershing knew that Stanford was subject to virtually nonexistent regulation in Antigua; that Pershing continued to lobby SGC to procure an audit from a reputable auditing firm yet was consistently delayed and/or refused; and that the numerous red flags remained unanswered for many months during Pershing and SGC's relationship.

92.     Pershing also defrauded the Plaintiffs named herein by making fraudulent statements to the SGC FAs that Pershing intended to be communicated to the FAs' customers. These fraudulent communications included, but were not limited to, advising FAs and prospective FAs that Pershing had completed its due diligence into SIBL and the CDs SIBL issued and gave them both its stamp of approval; the statements by the Chief Executive Officer of Pershing contained in a blast email in October 2008 to the FAs of SGC advising them to remain calm in a turbulent stock market because of Pershing's financial strength and the financial strength of its parent company, Bank of New York Mellon; and sending a "Pershing Bulletin" in December 2008 to the FAs with a form letter for the FAs to send to their SGC customers advising them of the financial strength of Pershing and Bank of New York Mellon and that the customers' assets were covered by other forms of insurance.

93.     The general awareness by Pershing of the above described factors imputes specific knowledge by Pershing of wrongdoing by Stanford which is tantamount to scienter and forms the basis for this common law aiding and abetting fraud cause of action.

94.     Plaintiffs seek an award against Pershing of actual damages, attorneys' fees and costs as provided by law.

## COUNT THREE
## BREACH OF THIRD-PARTY INTENDED BENEFICIARY CONTRACT

95.     Plaintiffs repeat, reallege and adopt all preceding paragraphs as if fully set forth herein.

96.     Pershing entered into specific contracts with FINRA (such as NASD/FINRA Member agreements), and the SEC to which Plaintiffs were intended third-party beneficiaries. Pursuant to those contracts/agreements, Pershing agreed to comply with all securities industry rules and regulations and to comply with federal laws, state laws, and NASD/FINRA Conduct Rules.

97.     Pershing breached said third-party beneficiary contract by failing to comply with its contractually-imposed obligations, i.e., Pershing violated governing state and federal laws and securities rules and regulations which thereby perpetuated the Stanford Ponzi scheme, enabling SIBL to continue to issue fraudulent CDs to investors such as Plaintiffs herein, thereby defrauding Plaintiffs out of all of their investment funds.

98.     Plaintiffs seek an award against Pershing of actual damages, attorneys' fees and costs as provided by law.

WHEREFORE, Plaintiffs pray the Defendant be summoned to answer this Complaint and that this case be tried before a jury and for relief and judgment as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as the Class Representatives under Rule 23(b)(3) and Plaintiffs' counsel as Class Counsel;

B.     Awarding Plaintiffs and the putative class compensatory damages and all other damages allowable by law;

C.      Awarding Plaintiffs and the putative class pre-judgment interest, costs, and reasonable attorneys' fees;

D.      Awarding Plaintiffs a reasonable award for serving as Class Representatives; and,

E.      Granting other such relief as this Court deems just and proper.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs

By:    /s/ James E. Cecchi
       JAMES E. CECCHI

Dated:  May 3, 2016

Scott D. Hirsch                    Daniel E. Gustafson
Charles E. Scarlett                Daniel C. Hedlund
SCARLETT & HIRSCH, P.A.            David A. Goodwin
7777 Glades Road, Suite 200        Eric S. Taubel
Boca Raton, FL 33434               GUSTAFSON GLUEK PLLC
(561) 278-6707                     Canadian Pacific Plaza
(561) 278-6244                     120 South Sixth Street, Suite 2600
                                   Minneapolis, MN 55402
Michael E. Criden                  (612) 333-8844
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, FL 33143
(305) 357-9000

## JURY DEMAND

Plaintiffs demand trial by jury as to all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiffs

By:___/s/ James E. Cecchi_____
JAMES E. CECCHI

Dated:  May 3, 2016

Scott D. Hirsch
Charles E. Scarlett
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Suite 200
Boca Raton, FL 33434
(561) 278-6707
(561) 278-6244

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, FL 33143
(305) 357-9000

Daniel E. Gustafson
Daniel C. Hedlund
David A. Goodwin
Eric S. Taubel
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844